UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

DARREN HARRIS,

                    Plaintiff,

                                                    **MEMORANDUM & ORDER**
          v.                                        14-CV-5123 (PKC)

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

          Plaintiff Darren Harris ("Harris" or "Plaintiff"), proceeding *pro se*, commenced this

action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's

("SSA's") denial of his claim for disability benefits under Title II of the Social Security Act (the

"Act").    (Dkt. 1.)    Defendant, the Acting Commissioner of Social Security (the

"Commissioner"), moves for judgment on the pleadings, affirming the Commissioner's final

decision.  Fed. R. Civ. P. 12(c); (Dkt. 14).  For the reasons set forth below, the Court denies the

Commissioner's motion.

*BACKGROUND*

   I.   Procedural History

          Plaintiff protectively filed an application for disability insurance benefits on August 2,

2011, alleging that he was disabled beginning December 19, 2010.  (Tr. 9.)  Plaintiff alleged

disability due to spinal problems and hearing problems in both ears.  (Tr. 134.)  This application

was denied on December 23, 2011.  (Tr. 9, 62, 63-69.)  Plaintiff then requested a hearing before

an administrative law judge ("ALJ"), and on February 6, 2013, Plaintiff appeared at a hearing

before ALJ Patrick Kilgannon.  (Tr. 9, 23-55, 70.)  After considering the case *de novo*, the ALJ

issued a decision on February 28, 2013, finding that Plaintiff was capable of performing jobs that existed in significant numbers in the national economy. (Tr. 6-22.) The ALJ's decision became final on June 27, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-4, 5.) This action followed.

II.   Administrative Record

A.   Medical Evidence Prior to the Relevant Period

On July 14, 2009, Plaintiff visited Lenox Hill Hospital, complaining of back pain. (Tr. 191.) Plaintiff stated that he had been experiencing low back pain since lifting a heavy weight a few days earlier. (*Id*.) He described the pain level as 8/10, and the nature of the pain as constant and sharp. (*Id*.) His symptoms improved upon sitting. (*Id.*) Upon examination, his straight-leg-raise testing was negative, there was no tenderness to low back, there was a normal range of motion, strength was rated full (5/5) bilaterally, sensation was intact to light touch bilaterally, reflexes were intact and equal, bilaterally, and Plaintiff was able to heel and toe walk. (Tr. 193.) Plaintiff was diagnosed with sciatica, given Percocet, and discharged in stable condition. (Tr. 193-94.)

On August 14, 2009, Plaintiff went to Richmond University Medical Center ("RUMC") complaining of back pain. (Tr. 202.) He experienced pain radiating to his right leg, and sometimes to his left leg. (*Id.*) He also had swelling in his right leg. (*Id.*) Plaintiff was treating his pain with ibuprofen. (*Id.*) A physical examination revealed edema in the right leg, and vascular tests revealed deep vein thrombosis ("DVT") in the right leg. (Tr. 202, 209.) Plaintiff was admitted and treated with Lovenox and Coumadin. (Tr. 203.)

While admitted, a magnetic resonance imaging ("MRI") scan of his lumbar spine taken on August 19, 2009 showed: disc degeneration and mild bulging at L1-2, L3-4, and L4-5; mild

right paracentral disc protrusion at L2-3; large right paracentral disc extrusion at L5-S1 with marked effacement of the anterior thecal sac and marked lateral recess stenosis on the right; and transitional vertebral body, which was regarded as a partially lumbarized S1. (Tr. 212-13.) Plaintiff underwent a discectomy on August 26, 2009 to repair a herniated disc at L5-S1. (Tr. 203, 217-19.) The procedure was performed by Dr. Anthony Alastra. (Tr. 217.) Plaintiff was discharged from RUMC on September 2, 2009. (Tr. 202.)

On October 19, 2009, Plaintiff saw physician assistant ("PA") Elaina Mastrangelo and Dr. Alastra for a post-surgery follow-up exam. (Tr. 237.) Plaintiff was doing well, and denied any pain in his lower back or legs. (*Id.*) There was fatigue in his legs, which the doctor noted was normal following surgery. (*Id.*) Upon examination, Plaintiff had full (5/5) strength in his legs with good dorsi and plantar flexion bilaterally. (*Id.*)

On November 23, 2009, Plaintiff saw PA Ying Shen and Dr. Alastra for a second follow-up exam. (Tr. 236.) Plaintiff was doing very well, and had completed his physical therapy. (*Id.*) Plaintiff reported a 95% improvement in all of his symptoms. (*Id.*) He was not taking any pain medication, and his employer had transferred him to a different position that did not require much bending or stooping. (*Id.*) He was still receiving Coumadin to treat his DVT, but was neurologically stable. (*Id.*; *see* Tr. 370-99 (treatment notes from Richmond University Medical Center)). Plaintiff would continue to treat himself with home exercises. (Tr. 236.)

B. Medical Evidence During the Relevant Period

Doppler imaging of Plaintiff's legs taken on December 20, 2010 was normal, and revealed no evidence of DVT. (Tr. 433.)

An August 2, 2011 audiological evaluation revealed moderately severe hearing loss in both of Plaintiff's ears. (Tr. 254.)

On September 9, 2011, Plaintiff saw Dr. Douglas Schwartz, an osteopathic doctor. (Tr. 285.) Plaintiff reported exacerbations of pain in his lower back and numbness/tingling in his right leg. (*Id.*) He was intolerant to prolonged sitting or standing, and complained of interrupted sleep. (*Id.*) Plaintiff treated his pain with over-the-counter ("OTC") medication and home exercises. (*Id.*) On examination, there was pain on palpation over the bilateral lower lumbosacral paraspinals, extending to the bilateral upper gluteal regions. (*Id.*) Mild atrophy persisted in the right quadriceps. (*Id.*) There was also swelling in the right calf. (*Id.*) In his lumbar spine, flexion was 45 degrees, extension was five degrees, and lateral bending was 10 degrees on both sides. (*Id.*) Sensation to light touch was diminished on the right side at L-4 and L-5. (*Id.*) Straight-leg-raise testing was positive at 60 degrees in the seated position, and increased in the Linder and Bragard positions. (*Id.*) Muscle strength was full (5/5). (*Id.*) The diagnosis was lumbosacral derangement and DVT in the right leg. (*Id.*) Dr. Schwartz recommended that Plaintiff continue to treat his condition with home exercises and OTC medication, as needed. (*Id.*) He wrote that Plaintiff should refrain from lifting, carrying, pushing, or pulling over 25 pounds, and avoided prolonged sitting or standing and repetitive stair climbing. (*Id.*) Plaintiff was also advised to change between sitting and standing positions every one to two hours. (*Id.*)

A September 23, 2011 computed tomography ("CT") scan of Plaintiff's head taken to evaluate hearing loss, revealed an asymmetry in the size of the lateral ventricles, right larger than left, which was likely developmental in nature. (Tr. 319.) Otherwise, the scan was unremarkable. (*Id.*)

On October 3, 2011, Dr. Sujit Chakrabarti conducted a consultative orthopedic examination of Plaintiff. (Tr. 263-67.) Plaintiff's chief complaints were a stiff back, numbness

in both feet, and difficulty hearing.  (Tr. 264.)  The stiff back and numb feet began on July 14, 2009.  (*Id.*)  Plaintiff reported previous work as a security guard, but was unable to continue in that job due to his DVT.  (*Id.*)  The numbness in his feet was "90% better" following his August 2009 discectomy.  (Tr. 265.)  Plaintiff did not have "any definite pain," but noted "some stiffness of the back".  (*Id.*)  The stiffness gradually improved throughout the day.  (*Id.*)  Plaintiff also complained of pain in his left wrist, for which he had been using a brace for "many years"; pain in his neck; and numbness of the right second, third, and fourth fingers.  (*Id.*)  He was not receiving any physical therapy.  (*Id.*)  Plaintiff stated that he sometimes had difficulty sleeping due to anxiety.  (*Id.*)  He did not have any difficulties with standing or walking, but claimed that he could not sit for more than 15-20 minutes due to pain and stiffness.  (Tr. 265-66.)  Plaintiff, who was not married and had no children, performed as many chores as he could; occasionally friends or relatives helped with chores.  (Tr. 266.)

Upon examination, Plaintiff was 6'2" in height, and weighed 316 pounds.  (*Id.*)  He had good finger dexterity and grip strength.  (*Id.*)  He walked very slowly on the outer side of both heels.  (*Id.*)  Plaintiff could partially squat and slowly climbed on to the examination table without any problem.  (*Id.*)  There was definite impaired sensation in the toes and in some fingers on the right hand.  (*Id.*)  Forward elevation of the shoulders was 110/150 degrees; abduction was 110/150 degrees; adduction was full; internal rotation was 30/40 degrees; and external rotation was 70/90 degrees.  (*Id.*)  Elbow extension was 120/150 degrees.  (*Id.*)  Dorsiflexion was full on the right side and 50/60 degrees on the left; palmar flexion was full on the right and 60/70 degrees on the left; and both radial and ulnar deviation were full on both sides.  (*Id.*)  Flexion of the knees was 110 degrees with no pain.  (*Id.*)  Hip forward flexion was 90/110 degrees with no pain; internal rotation was 30/40 degrees on both sides.  (*Id.*)  Plaintiff's

cervical spine showed lateral flexion to 40/45 degrees, full flexion, full extension, and rotation to 35/45 degrees. (*Id.*) The lumbar spine showed flexion and extension to 60/90 degrees, and lateral flexion to 25 degrees. (*Id.*) Straight-leg-raise testing was 60 degrees bilaterally. (*Id.*) Dorsiflexion was normal and an ankle examination was normal. (*Id.*) Dr. Chakrabarti concluded that Plaintiff was grossly overweight and that there was a restriction of movement "of both shoulders and elbow [sic]". (Tr. 266-67.) The doctor also noted "deafness." (Tr. 267.) The prognosis was guarded. (*Id.*)

On December 20, 2011, Dr. Andrew Cheng, an otolaryngologist, conducted a consultative hearing examination of Plaintiff. (Tr. 270.) Plaintiff had been using hearing aids in both ears since February 2011. (*Id.*) There was no history of ear infections, and Plaintiff was able to communicate in English fluently. (*Id.*) Upon examination, Plaintiff had normal ear canals with no mass lesions, and normal bilateral eardrums. (*Id.*) Speech reception threshold ("SRT") was 55 decibels on the right and 60 decibels on the left. (*Id.*) Hearing thresholds were 40-65 decibels on the right and 45-70 decibels on the left. (*Id.*) Speech discrimination score was 100% in both ears. (*Id.*) Plaintiff was noted to have performed "well" on speech testing. (*Id.*) The diagnosis was bilateral moderate-severe neuro-sensory hearing loss. (*Id.*) The recommended treatment was for continued use of bilateral hearing aids. (*Id.*)

On December 23, 2011, State agency medical consultant, Dr. Lourdes Marasigan determined that Plaintiff's hearing loss did not meet the criteria of a Listing. (Tr. 275.) In support of this determination, Dr. Marasigan cited to the results of Dr. Cheng's examination, which was conducted without Plaintiff's use of hearing aids. (*Id.*) Specifically, Dr. Marasigan noted the SRT of 55 decibels on the right and 60 decibels on the left, and the 100% speech discrimination in both ears. (Tr. 270, 275.) Dr. Marasigan determined that Plaintiff was

precluded only from work where perfect hearing was required, such as a musical conductor. (Tr. 275.)

Plaintiff visited RUMC on January 4, 2012, reporting left wrist pain. (Tr. 412.) An x-ray taken on December 8, 2011, had been negative for dislocation, but showed a widening of the joint spaces. (Tr. 412, 431.) On January 23, 2012, Plaintiff continued to complain of left wrist pain upon "twisting," but said that it did not radiate. (Tr. 414.) His range of motion was not impaired, but there was pain upon abduction of the wrist. (*Id.*) Strength in the left wrist was 3/5. (*Id.*) On February 6, 2012, Plaintiff's wrist pain continued and he also noted right knee pain when using stairs. (Tr. 415.)

On February 6, 2012, Plaintiff saw Dr. Helen Kim, an otolaryngologist at Clove Lakes Ear, Nose, and Throat ("Clove Lakes"). (Tr. 336-40.) Plaintiff's chief complaint was hearing difficulties, which had progressively worsened over the previous year. (Tr. 337-38.) Plaintiff described ringing in both ears and a muffling and distorting of sounds. (Tr. 338.) It limited his daily activities and resulted in difficulties understanding and hearing speech over background noise, but he denied any ear pain or pressure. (*Id.*) His hearing aids improved his hearing. (*Id.*) He also complained of snoring and gasping at night. (*Id.*) Plaintiff's medications included amoxicillin, ibuprofen, and nasal sprays. (Tr. 337.) A physical examination of the ears were unremarkable. (Tr. 338.) Examination of the nose revealed a deviated septum to the right and bilateral inferior turbinate hypertrophy. (*Id.*) Diagnoses included deviated nasal septum, hypertrophy of nasal turbinates, chronic rhinitis, unspecified chronic sinusitis, other voice and resonance disorders, unspecified hearing loss, and a nontoxic uninodular goiter. (Tr. 339.)

A February 20, 2012 ultrasound of Plaintiff's thyroid showed normal results. (Tr. 356.)

Plaintiff returned to Clove Lakes on March 5, 2012, and saw PA Daniele Kouroupos. (Tr. 334-36.) There were no significant changes in Plaintiff's condition since February 6. (*Id.*) On March 16, 2012, Plaintiff reported that his snoring had improved with weight loss. (Tr. 331-32.)

On April 3, 2012, Plaintiff saw Dr. Perry Drucker, a physiatrist. (Tr. 445.) His chief complaints were DVT, left wrist pain, and numbness in his left thumb and the second, third, and fourth fingers on his right hand. (*Id.*) He reported moderate difficulty with fine motor activities and difficulty with activities of daily living. (*Id.*) Sensation testing revealed impaired sensation to light touch and pin prick bilateral median nerve distribution. (*Id.*) An electromyogram ("EMG") nerve conduction study revealed moderate-severe right sided sensory deficit and mild-moderate sensory deficit on the left side, consistent with carpal tunnel syndrome. (Tr. 446.)

On April 27, 2012, Plaintiff saw Dr. Kim again and no significant changes in his condition were noted. (Tr. 328-30.)

A May 14, 2012 treatment report from RUMC noted that Plaintiff continued to report left wrist pain, but he said he otherwise was "feeling well". (Tr. 418.) He also reported depression due to his inability "to get to work". (Tr. 419.)

Plaintiff saw PA Tammy Wood at Clove Lakes on May 21, 2012. (Tr. 324-27.) His snoring continued to improve, but there was no improvement in his hearing loss. (Tr. 326.)

A May 25, 2012 MRI of Plaintiff's brain revealed no evidence of acoustic schwannoma or other intracranial abnormality. (Tr. 288.)

A June 4, 2012 treatment report from RUMC again noted wrist and knee pain. (Tr. 420.) X-rays were reportedly negative for fractures or osteoarthritis. (*Id.*) There were no range of motion limitations, and Plaintiff was in stable condition. (*Id.*)

On June 9, 2012, Plaintiff underwent a sleep study due to complaints suggestive of obstructive sleep apnea and hypopnea syndrome. (Tr. 292-96.) Plaintiff demonstrated mild obstructive sleep apnea with associated snoring and frequent arousals. (Tr. 296.) Plaintiff had a body mass index ("BMI") of 41 and was morbidly obese. (*Id.*)

Plaintiff saw PA Wood at Cloves Lake again on June 11, 2012, with no significant changes in his condition noted. (Tr. 322-24.)

On June 15, 2012, Plaintiff saw occupational therapist Farah Proce at RUMC for joint pain in his left wrist. (Tr. 434-36.) His pain worsened upon supination and extension. (*Id.*) Heat and stretching improved the pain. (Tr. 435.) There were no range of motion limitations. (*Id.*) Plaintiff reported difficulty cutting food and showering, and pain upon dressing. (*Id.*) Plaintiff, who was right-handed, was unemployed, but looking to return to work. (*Id.*)

Plaintiff had a second occupational therapy ("OT") session on June 18, 2012. (Tr. 440.) Following the therapy, it was noted that Plaintiff was progressing towards his goal of returning his left hand to its prior level of functioning. (Tr. 440-41.) After a third session on June 22, 2012, Plaintiff's pain was noted to have decreased. (Tr. 443.) Plaintiff attended three more OT sessions between July 3, 2012 and July 13, 2012. (Tr. 504-09.) Decreased pain and/or progression towards his goal was consistently noted following these sessions. (Tr. 504-09.) On July 3, 2012, his pain level was 3/10, and on July 13, 2012, Plaintiff reported a pain level of 0/10. (Tr. 508.)

On July 7, 2012, Plaintiff attended a second sleep study. (Tr. 342-45.) He underwent a successful continuous positive airway pressure ("CPAP") titration, and was advised to begin using a CPAP machine at night. (Tr. 345).

Plaintiff saw Dr. Kim at Clove Lakes again on September 10, 2012. (Tr. 475.) His hearing loss had not improved, and the ringing in his ears continued. (Tr. 476.) An examination indicated that there were no significant changes in his condition. (Tr. 476-77.)

Plaintiff visited RUMC on November 19, 2012, reporting intermittent low back pain, which worsened upon movement. (Tr. 516.) He stated that physical therapy had not improved his wrist pain. (Tr. 517.) He rated his pain level as 5/10. (Tr. 516.)

Plaintiff saw Dr. Kim at Clove Lakes again on December 11, 2012, with no significant changes noted. (Tr. 472-75.)

Between December 14 and December 17, 2012, the Federation Employment and Guidance Services ("FEGS")[1] completed a biopsychosocial evaluation of Plaintiff. (Tr. 479-501.) This report was completed by Venus Keye, a social worker, Jennifer Perez, a qualified health professional, and Dr. Artur Mushyakov, an internist. (Tr. 479-501.) Plaintiff had never received mental health treatment. (Tr. 486.) He reported feeling down or depressed "nearly every day", and had little interest or pleasure in doing things. (*Id.*) Plaintiff also reported daily fatigue, difficulty falling asleep, and poor appetite. (*Id.*) He had no trouble concentrating and no thoughts of self-harm. (Tr. 487.) He was able to wash dishes, do laundry, clean, watch television, shop, cook, read, socialize, dress himself, and bathe and groom himself. (Tr. 488.) Ms. Keye noted that Plaintiff had difficulty interacting with others. (Tr. 489.)

Plaintiff complained of lower back pain. (Tr. 491.) He was not taking any medication for his pain, but said that he had taken two aspirins the previous night. (Tr. 492.) A physical examination revealed low back pain, mild to moderate limitations bending and extending his

---

[1] FEGS, a non-profit organization, works to provide a variety of health and human services, including employment, career, and workforce development. *See* http://www.fegs.org/what-we-do (last visited September 24, 2015).

back, moderate limitations raising his legs bilaterally, and mild distress rising from the chair. (Tr. 494.) Motor strength, sensation, and reflexes were normal. (*Id.*) Mental status examination revealed plaintiff's mood to be mildly sad and depressed. (*Id.*)

Dr. Mushyakov opined that Plaintiff could sit, climb, kneel, stand, pull, and bend for a total of one-to-three hours each and lift, carry, push, and/or pull up to ten pounds one-to-ten times each hour. (Tr. 494-95.) Plaintiff was diagnosed with unspecified backache, unspecified hearing loss, and depressive disorder, all noted to be stable. (Tr. 497.) Plaintiff would require the following work accommodations: he would need to avoid lifting, carrying, pulling, and pushing heavy objects; avoid climbing, kneeling, prolonged sitting, prolonged standing, and excessive bending; and avoid high stress. (*Id.*) Plaintiff could work part-time with accommodations and would benefit from vocational rehabilitation and support. (Tr. 498.)

On January 1, 2013, Plaintiff saw Farzana Naqvi at RUMC for physical therapy of his back. (Tr. 510-13.) Plaintiff reported difficulty bending, standing, sitting, getting on the bus, sleeping, and climbing steps. (Tr. 511.) He described his pain level as 8/10. (Tr. 511.) Flexion was 50 degrees, extension was ten degrees, right and left side bending were both 10 degrees, and rotation was 20 degrees. (Tr. 512.) He was instructed on home exercises and treated with heat and therapeutic exercises. (Tr. 513.) After treatment, Plaintiff's pain level was 6/10. (*Id.*)
In a January 8, 2013 treatment note from RUMC, Plaintiff reported numbness in his feet. (*Id.*)

Plaintiff returned to physical therapy on January 11, 2013. (Tr. 514.) Before treatment, Plaintiff's pain level was 5/10, and after treatment, the level decreased to 4/10. (Tr. 515.)

Plaintiff saw Dr. Schwartz again on January 28, 2013. (Tr. 503.) He reported exacerbations of pain in his lower back, numbness/tingling in his right leg, intolerance to prolonged sitting or standing, and interrupted sleep. (*Id.*) For treatment, Plaintiff was still taking

OTC medication and performing home exercises.  (*Id.*)  The examination results and doctor's conclusions were identical to those reported by Dr. Schwartz on September 9, 2011.  (*Id.*)

    C.  <u>Non-Medical Evidence</u>

        1.  <u>Questionnaires</u>

On August 23, 2011, Plaintiff completed a Function Report and Pain Questionnaire.  (Tr. 142-53.)  In terms of daily activities, Plaintiff stated that he did not do "much out of the ordinary".  (Tr. 143.)  He had no problems attending to his personal care and prepared his own meals on a daily basis.  (Tr. 143-44.)  Plaintiff performed normal house and yard work, such as sweeping and dishes.  (Tr. 145.)  He went out every day, could go out alone, used public transportation, and went food shopping a couple of times a week.  (Tr. 145-46, 147.)  His hobbies included basketball, movies, arcade game repair, music, and reading, but he only read and watched DVD movies on a daily basis.  (Tr. 146.)  He no longer performed certain activities because of either physical or financial reasons.  (Tr. 147.)  He had no problems getting along with family, friends, neighbors, or authority figures.  (Tr. 147, 149).  His hearing problems prevented him from engaging in social activities.  (Tr. 147.)  He could lift light objects, but needed to be careful with heavy objects.  (*Id.*)  He had no problems standing, once his "back warm[ed] up," and he could stand for long periods, but "bending over [could] be an issue".  (*Id.*) His ability to walk varied from day-to-day; he could not sit for long; kneeling and squatting were difficult; and he had difficulty understanding speech (even when using his hearing aids).  (Tr. 148.)  He wore his hearing aids at all times.  (*Id.*)  On bad days, he could walk a couple of blocks before needing to rest for one to two minutes.  (*Id.*)  He stated that he had difficulty understanding speech, even with his hearing aids.  (*Id.*)

Plaintiff alleged "inconsistent" pain in his neck and back, but stated that it was not a major problem. (Tr. 150.) He injured his back in July 2009, but after surgery, the pain was only occasional and not extreme, so long as he was careful. (*Id.*) He received no treatment for the occasional pain. (*Id.*) The pain could sometimes be sharp, but was usually dull in the morning. (Tr. 151.) Sometimes, the neck pain radiated to his chest and back. (*Id.*) He did not often experience pain, but straining or sudden movements could cause pain. (*Id.*) He took no medication, other than Advil occasionally. (*Id.*) Pain was not usually a significant problem. (Tr. 152.)

2. <u>Administrative Hearing</u>

On February 28, 2013, Plaintiff testified before the ALJ. (Tr. 23-55.) He was 47 years-old, had graduated from high school, and received training as a security guard. (Tr. 28.) He last worked in 2010. (Tr. 29.) Plaintiff injured his back and underwent surgery in August 2009. (*Id.*) Following the surgery, he was able to return to work, but was discharged by his employer on December 19, 2010 allegedly in retaliation for Plaintiff's worker's compensation claim. (Tr. 30.) His past work experience only included security positions. (Tr. 43.)

Plaintiff testified that he began attending physical therapy twice a week for his back in January 2013. (Tr. 31.) He took no medication for his back pain. (Tr. 32.) Plaintiff had also attended occupational therapy for carpal tunnel syndrome the previous year. (Tr. 34.) He took no medication and did not use any wrist splints for his carpal tunnel syndrome. (Tr. 34-35.) Plaintiff also stated that he was diagnosed with arthritis and had numbness in his right arm. (Tr. 35).

Plaintiff had difficulty hearing. (Tr. 32.) He could use a hearing aid compatible phone, but was unable to use a payphone or regular cell phone. (Tr. 33.) His only treatment was use of

hearing aids. (*Id.*) He testified that he would sometimes turn up the volume on his hearing aids to the point where background noise was "too loud," but would still be unable to hear voices. (Tr. 42.) His hearing difficulties had resulted in a couple of bad job interviews. (*Id.*) He did not know sign language or how to read lips. (*Id.*)

During the week, Plaintiff attended classes at FEGS, and participated in a Work Experience Program as a requirement for receiving public assistance. (Tr. 36.) He attended classes at FEGS two days a week, and volunteered at a food pantry three days a week. (Tr. 37-38.) He re-injured his back when lifting a 60-pound bag at the food pantry. (Tr. 41.) As a result of this injury, he could sit for only a few minutes before he needed to stand up. (*Id.*) Plaintiff participated in no psychological treatment and took no psychological medication. (Tr. 33.)

3. Testimony of Vocational Expert

At the February 2013 hearing, the ALJ also took testimony from vocational expert ("VE") Peter Manzi. (Tr. 44-55, 105-12.) The VE identified Plaintiff's past work as a security guard (Dictionary of Occupational Titles ("DOT") Code No. 372.667-034), categorized as light, semi-skilled work. (Tr. 45.) The VE also noted that Plaintiff's past work could be identified as an armored car driver (DOT Code No. 372-567-010), medium, semiskilled work. (*Id.*)

The ALJ then presented the VE with the following hypothetical: an individual with the same age, education, and work experience as Plaintiff, who could lift up to a light level (*i.e.*, 20 pounds occasionally and 10 pounds frequently); stand or walk for approximately six hours per eight-hour workday, and sit for approximately six hours per eight-hour workday, with normal breaks; occasionally climb ladders, ropes, scaffolds, ramps, or stairs; and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 46.) The hypothetical individual had no manipulative limitations or limitations in reaching, could perform frequent bilateral handling, fingering, or

feeling, and was limited to occupations that did not require fine hearing, or frequent verbal or telephone communication, and was unskilled, low stress work (*i.e.*, only occasional decisionmaking and only occasional changes in the work setting). (*Id.*) The VE responded that such a hypothetical individual would be unable to perform Plaintiff's past work. (Tr. 46-47.)

However, the VE did identify several other jobs that such a hypothetical individual could perform. (Tr. 47-49.) Specifically, the VE identified laundry sorter (DOT Code No. 361.687-014)–light, unskilled work with 128,478 positions nationally and 1,200 positions locally; collator operator (DOT Code No. 208-685-010)—light, unskilled work with 44,148 positions nationally and 1,700 positions locally; and photocopy machine operator (DOT Code No. 207-685-014)—light, unskilled work with 33,865 positions nationally and 12 positions locally. (Tr. 48.)

The ALJ then posed a second hypothetical, identical to the first hypothetical, except that the individual was limited to sedentary work (*i.e.*, could lift up to 10 pounds occasionally and sit for approximately six hours in an eight-hour workday, with normal breaks). (Tr. 48-49.) The VE testified that such an individual could perform the following jobs: inspector (DOT Code No. 739.687-182)—sedentary, unskilled work with 13,324 positions nationally and 60 positions locally; addresser (DOT Code No. 209.587-010)—sedentary, unskilled work with 25,242 positions nationally and 1,600 positions locally; and final assembler (DOT Code No. 713.687-018)—sedentary, unskilled work with 22,000 positions nationally and 500 positions locally. (Tr. 49.) If the individual was limited to less than sedentary work, the VE testified that all employment would be precluded. (Tr. 49.)

In response to questions from Plaintiff's counsel, the VE stated that the hypothetical individual would be precluded from performing any of the identified positions if he was limited

to only moderate or occasional levels of manipulation. (Tr. 50-51.) However, such a person

could perform the light level position of investigator, dealer accounts[2] (DOT Code No.

241.367-038) with 66,355 positions nationally and 596 positions locally, and the sedentary level

position of surveillance system monitor (DOT Code No. 379.367-010) with 16,070 position

nationally and 500 positions locally. (Tr. 52-53.)

## STANDARD OF REVIEW

I.    Review of Administrative Decisions

In reviewing a final decision of the Commissioner, the Court's duty is to determine

whether it is based upon correct legal standards and principles, and whether it is supported by

substantial evidence in the record, taken as a whole. *See Talavera v. Astrue*, 697 F.3d 145, 151

(2d Cir. 2012) (the Court "is limited to determining whether the [Social Security

Administration's] conclusions were supported by substantial evidence in the record and were

based on a correct legal standard"). "'Substantial evidence is more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*,

402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted). In determining

---

[2] An "investigator, dealer accounts" is someone who:

> Visits dealers to verify purchases financed by bank against physical inventory of
> merchandise. Reviews computer printouts listing customer names, addresses, and
> descriptions of merchandise financed through bank credit and chattel mortgage
> accounts to plan itinerary of unannounced visits to dealer premises. Explains
> purpose of visit and locates merchandise in areas, such as showroom, storage
> room, or car lot. Observes features of merchandise, such as size, color, model, and
> serial number, to verify item against computer printout. Examines records and
> questions dealer to determine disposition of items missing from inventory and to
> elicit information on dealer arrangement for payment to bank for merchandise
> sold. Records findings on printout and notifies supervisor of unusual findings.

DOT Index, *at* http://www.occupationalinfo.org/24/241367038.html (last visited 9/29/15).

whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013).

## DISCUSSION

I.    Disability Under the Social Security Act

The Act provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for Social Security Disability benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). The Act's regulations prescribe a five-step analysis for the Commissioner to follow in determining whether a disability benefit claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a); *Talavera*, 697 F.3d at 151.

First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If not, the Commissioner proceeds to the second inquiry, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third inquiry, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations (the "Listings"). If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iii).

If not, the Commissioner proceeds to the fourth inquiry, which is whether, despite claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past work. 20 C.F.R. § 404.1520(a)(4)(iv). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that he or she can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving his or her case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in

the national economy that the claimant could perform.  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

II.     The ALJ's Decision

Prior to engaging in the five-step sequential evaluation set forth at 20 C.F.R. § 404.1520(a)(4), the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2015.[3]  (Tr. 11.)  At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 19, 2010.  (*Id.*)  At step two, the ALJ found that Plaintiff had the following severe impairments: lumbosacral derangement with a history of surgery; bilateral hearing loss; bilateral carpal tunnel syndrome; obesity; and depression.  (*Id.*)  At step three, the ALJ found that Plaintiff's impairments did not meet or equal the criteria of the Listings in Appendix 1 to 20 C.F.R. Part 404, Subpart P.  (Tr. 12-13.)  The ALJ then found that Plaintiff had the RFC to perform a range of light work, with the following additional limitations: Plaintiff could occasionally climb ladders, ropes, scaffolds, ramps, or stairs; occasionally balance, stoop, kneel, crouch, or crawl; reach without limitation, including overhead reaching; and frequently feel, finger, and handle.  (Tr. 13-16.)  Additionally, Plaintiff was limited to jobs that did not require fine hearing capabilities, with no frequent verbal or telephone communication; and Plaintiff was limited to unskilled tasks in a low stress job (*i.e.*, only occasional decision-making and only occasional changes in the work setting).  (*Id.*)  At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work.  (Tr. 16.)  At step five, the ALJ then considered Plaintiff's RFC, age, education, and past work experience, and with vocational expert assistance found that Plaintiff could perform work that exists in significant numbers in the national and

---

[3] Plaintiff's earning records show that he has acquired sufficient quarters of coverage to remain insured through December 31, 2015.  (Tr. 11).

local economies. (Tr. 16-17.) Thus, the ALJ found Plaintiff not disabled under the Act. (Tr. 17-18.)

III.   <u>Analysis</u>

   A.  <u>Erroneous Step-Two Severity Determination</u>

The ALJ found that Plaintiff has the following severe impairments: lumbosacral derangement with history of surgery; bilateral hearing loss; bilateral carpal tunnel syndrome; obesity; and depression.[4] (Tr. 11.) The ALJ noted that Plaintiff was diagnosed with a history of DVT, Obstructive Sleep Apnea ("OSA"), and mild hypertension, but that these are non-severe impairments.[5]

While the ALJ properly considered and weighed much of the record evidence, he did not sufficiently consider or develop the record with respect to three issues: (1) whether Plaintiff's need to change between sitting and standing every one to two hours is consistent with the ability to sit for six hours during an eight-hour workday with "normal breaks", as the ALJ hypothesized for the VE's evaluation; (2) Plaintiff's ability to hear and discern speech; and (3) the nature and degree of Plaintiff's depression, and whether it affected his ability to function in a work setting.

---

[4] Plaintiff alleges in his complaint that he is entitled to benefits because of the following disabilities: (1) severe back pain; (2) severe hearing loss; (3) mental illness; (4) herniated and bulging disc in lumbar; (5) degenerative pulmonary condition changes; (6) sleep apnea. (Dkt. 1.) Although it is unclear what "degenerative pulmonary conditions" Plaintiff is referring to, the ALJ did address Plaintiff's sleep apnea, which is a pulmonary condition. There is no evidence in the record indicating any additional pulmonary impairment.

[5] The ALJ based this decision on the fact that (1) Plaintiff had a normal bilateral venous color duplex Doppler imaging of his lower extremities that showed no evidence of DVT; (2) could complete his activities of daily living with no residual effects from his OSA; (3) and that his hypertension is only mild. (Tr. 11.)

B.  The ALJ Improperly Evaluated Plaintiff's Severe Impairments

At the second stage of the ALJ's review, he must determine whether the claimant has a severe impairment that significantly limits his physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 416.920(c).  The severity analysis should include *all* of Plaintiff's diagnosed impairments, and *combination* of impairments.  *Burgin v. Astrue*, 348 F. App'x 646, 647, 648-49 (2d Cir. 2009) (when determining the severity of impairments, the Commissioner is required to "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits") (citing 20 C.F.R. § 404.1523); *see also Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe.").  If the combined effect of all of the claimants' impairments is not severe, he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii), (c).

1.  Plaintiff's Physical Impairments

In determining whether an impairment is "severe" or a combination of impairments is "severe", the ALJ must properly assess the opinions of the medical sources regarding the claimant's physical impairments.  The relevant factors for the ALJ to consider in determining the weight to be accorded a medical opinion include: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the physician, and (6) other factors.  20 C.F.R. § 404.1527(c)(1).  A treating physician's report is generally given more weight than other reports and a treating physician's opinion will be controlling if it is "well-supported by medically

acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record." *Id.* § 404.1527(c)(2)). When a treating physicians' opinion is not given controlling weight, the aforementioned factors are considered in determining the weight that should be given to that opinion. *Id.* § 404.1527(c)(1).

a. Plaintiff's Back and Leg Impairments

Plaintiff's treating physician, Dr. Schwartz, found on September 9, 2011, *inter alia*, that Plaintiff could perform light work with no repetitive stair climbing activities, but would need to change between sitting and standing positions every one to two hours. (Tr. 285, 503.) Dr. Schwartz's conclusions are supported by his own examinations and are consistent with the evidence of record.[6] While assigning "significant weight" to Dr. Schwartz's opinions, the ALJ did not seem to factor Dr. Schwartz's opinion about the Plaintiff's limited ability to sit or stand for more than one or two hours at a time, as reflected in the hypothetical the ALJ posed to the VE, which described an individual who could sit for six-hours in an eight-hour workday "with normal breaks". (Tr. 15.) On its face, the inability to sit for more than one or two hours seems inconsistent with the ability to sit for six hours in an eight-hour workday with what are vaguely described as "normal breaks." To the extent the ALJ did not credit Dr. Schwartz's opinion that Plaintiff had to change position from sitting to standing every one to two hours, he should have explained the basis for that decision.[7] 20 C.F.R. § 416.927(c)(2) (a hearing officer must "give

---

[6] Notably, a month later, on October 3, 2011, Plaintiff reported to Dr. Chakrabarti, a state agency medical consultant, that while he (Plaintiff) did not have any difficulties with standing or walking, he could not sit for more than 15-20 minutes due to pain and stiffness. (Tr. 265-66.)

[7] Accordingly, the hypothetical proposed to the VE was incorrect insofar as it assumed that Plaintiff was able to sit for six hours in an eight-hour workday with "normal" breaks. In posing a hypothetical to a VE, there must be substantial evidence to support the assumption upon which the vocational expert bases his or her opinion. *See Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir. 1983). Here, substantial evidence did not support the proposition that plaintiff was

good reasons in [his] notice of determination or decision for the weight [he] give[s] [the claimant's] treating source's opinion."); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand).

Although the ALJ properly considered the opinion of Dr. Mushyakov from the December 2012 FEGS Report, Dr. Mushyakov did not opine about Plaintiff's ability to sit or stand for any length of time. (Tr. 479-501.) Dr. Mushyakov concluded that Plaintiff needed to avoid lifting, carrying, pulling, and pushing heavy objects; climbing, kneeling, prolonged sitting and standing, and excessive bending; and high stress. (Tr. 15, 497.) Dr. Mushyakov's conclusions are consistent with Plaintiff's reported independence in his daily activities, including his ability to wash dishes, do laundry, perform house work, watch television, shop, cook, read, socialize, dress himself, use public transportations, and bath and groom himself. (Tr. 14, 16, 143-46, 488.) Dr. Mushyakov's conclusions are also supported by the fact that Plaintiff does not take prescription medication for his alleged pain, and when he did report taking medication, it was OTC medicine. (Tr. 14, 32, 34-35, 36, 337, 492.)[8]

---

capable of sitting for six hours in an eight-hour workday with "normal" breaks. Therefore, the ALJ erred in posing the hypothetical to the vocational expert because it was not based on substantial medical evidence. The ALJ, in making his disability finding, should not have considered the VE's answer to the hypothetical because it was premised on incorrect information.

[8] The ALJ properly assigned no weight to the RFC assessment of disability examiner, "A. Lee". While the Commissioner allows disability examiners to "assist in completion of the RFC assessment forms," a medical consultant must sign the form "to attest that he/she is responsible for its content, including the findings of fact and discussion of supporting evidence." Social Security Administration, Programs Operations Manual System ("POMS") § DI 24510.005, ¶ B.2.b; see also 20 C.F.R. § 404.1546(a) ("When a [disability examiner] makes the disability determination, a State agency medical or psychological consultant(s) is responsible for assessing your residual functional capacity."). Here, the RFC assessment does not reflect that "A. Lee" is a physician or qualified medical consultant; indeed, he (or she) did not sign the

b. <u>Plaintiff's Hearing Issues</u>

The ALJ accorded "great weight" to the opinion of the state agency medical consultant Dr. Marasigan with regard to Plaintiff's ability to hear and discern speech. (Tr. 14, 275.) By contrast, the ALJ appears to have given no consideration or weight to the findings of Dr. Kim, Plaintiff's treating otolaryngologist. Although Dr. Marasigan's opinion was based on objective testing, the ALJ should have considered, or at least explained why he did not consider, Dr. Kim's findings, which contradict Dr. Marasign's somewhat remarkable conclusion that Plaintiff was only precluded from work where *perfect* hearing was required, such as a musical conductor. (Tr. 270, 275.)

Dr. Kim saw Plaintiff for the first time on February 6, 2012. During that exam, Plaintiff reported that for the past year, he had experienced worsening symptoms of ringing in both ears, and the muffling and distorting of sounds, which, he said, limited his daily activities and resulted in difficulties understanding and hearing speech over background noise. (Tr. 338.) Dr. Kim diagnosed Plaintiff as suffering from a deviated nasal septum, unspecified chronic sinusitis, voice and resonance disorders, and unspecified hearing loss. (Tr. 339.)[9] Dr. Kim saw Plaintiff three more times between February and December 2012, each time reporting no improvement in Plaintiff's hearing.

"Physician/Medical Spec. Signature" on the assessment form. Accordingly, the opinion cannot serve as the basis for the ALJ's RFC finding.

Although the ALJ did not discuss the weight that was given, if any, to the opinion of Dr. Drucker, his opinion did not contradict those of Drs. Schwartz and Mushyakov. (Tr. 445-449.) Dr. Drucker found that Plaintiff's symptoms were consistent with carpal tunnel syndrome, which the ALJ found was a severe impairment, and accounted for when determining Plaintiff's RFC. (Tr. 11, 13-16.)

[9] The ALJ, however, properly accorded no weight to Dr. Chakrabarti's notation about Plaintiff's "deafness", given that Dr. Chakrabarti is not an audiologist, and did not conduct any tests of Plaintiff's hearing. (Tr. 267.) *See* 20 C.F.R. § 404.1527(c)(3).

While Dr. Kim's findings do not appear to be based on any objective testing, the marked disparity between Dr. Marasign's finding of near-perfect hearing, second only to a musical conductor, without the use of any hearing aids, and Dr. Kim's four reports, during the same period of time, of Plaintiff experiencing voice and resonance disorders, and unspecified hearing loss, should have prompted the ALJ to inquire further about Dr. Kim's opinion of Plaintiff's ability to hear and discern speech, and the bases of her opinion. At a minimum, to the extent the ALJ decided not to accord any weight to Dr. Kim, he should have explained his reasoning, as required by the treating physician rule. 20 C.F.R. § 416.927(c)(2); *see also Snel*, 177 F.3d at 133; *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir.2009) (since disability-benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to develop a complete administrative record); *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004).[10] Accordingly, the ALJ erred in giving "great weight" to Dr. Marasigan's opinion without any consideration or development of Dr. Kim's findings.

2. Plaintiff's Mental Impairments

a. Plaintiff's Depression

The ALJ also erred by not giving due consideration to Plaintiff's depression, and by not considering the *combined* impairing effects of this mental condition and Plaintiff's physical impairments. *See Burgin*, 348 F. App'x at 647 (Commissioner must consider combined effect of all of claimant's impairments); *Dixon*, 54 F.3d at 1031. Despite finding that Plaintiff's

---

[10] While the ALJ did consider Plaintiff's hearing and verbal communication impairments, he did not acknowledge Plaintiff's deviated nasal septum and unspecified chronic sinusitis. (Tr. 339.) Though Plaintiff has not identified these as disabilities in his complaint, given his *pro se* status in this matter, the ALJ should determine on remand whether Plaintiff claims that these conditions were also disabling.

depression was a severe impairment, the ALJ concluded, without discussion, that it did not meet or equal any of the impairments in the Listings.

A May 2012 treatment report from RUMC noted that Plaintiff reported, *inter alia*, depression due to his inability "to get to work". (Tr. 419.) The December 2012 FEGS biopsychosocial similarly documented that Plaintiff, who had never received mental health treatment, reported feeling down or depressed "nearly every day" and having little interest or pleasure in doing things. (Tr. 33, 486.) Plaintiff also reported daily fatigue, difficulty falling asleep, and poor appetite. (*Id.*) Ms. Keye, a social worker who examined Plaintiff, noted that he had difficulty interacting with others. (Tr. 489.)

The evaluation of mental impairments follows a "special technique" pursuant to 20 C.F.R. § 404.1520. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) ("Th[e] regulations require application of a 'special technique' at the second and third steps of the five-step framework [ ] and at each level of administrative review.") (internal citations omitted). This technique requires "the reviewing authority to determine first whether [a] claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 180-81 (E.D.N.Y. 2011) (internal quotation marks and citations omitted); *see* 20 C.F.R. § 404.1520a(b), (c). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified . . . [,] the reviewing authority . . . will conclude that the claimant's mental impairment is not severe and will deny benefits." *Kohler*, 546 F.3d at 266.

If the ALJ determines that the claimant's mental impairment or combination of impairments is severe, "in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder," the ALJ "will first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders." *Id.* (citing 20 C.F.R. § 404.1520a(d)(2)). If an impairment or combination of impairments meets or medically equals the severity of one of the listed mental disorders, "the claimant will be found disabled." *Id.* If not, the reviewing authority will then assess the claimant's RFC. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)). The application of this technique shall be documented in the decision "at the initial and reconsideration levels of the administrative review process." *Id.* (citing 20 C.F.R. § 404.1520a(e)).

The ALJ's decision does not reflect any such analysis with respect to Plaintiff's depression. On remand, the ALJ shall apply this "special technique" with respect to Plaintiff's mental impairment, including an analysis of the combined effects of Plaintiff's depression and his physical impairments, such as his hearing difficulties and inability to sit or stand for more than one or two hours at a time.

### 3. Plaintiff's Testimony

The ALJ also considered Plaintiff's own statements and testimony at the administrative hearing when determining his RFC. *See Ocasio v. Astrue*, 32 F. Supp. 3d 289, 299 (N.D.N.Y. 2012) ("Courts in the Second Circuit have determined a claimant's subjective complaints are an important element in disability claims, and they must be thoroughly considered."). Subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged. 20 C.F.R. § 404.1529(b). When a medically

determinable impairment exists that reasonably could be expected to produce the pain alleged, objective medical evidence should be considered in determining whether a disability exists whenever such evidence is available. *Id.* § 404.1529(c)(2). If the claimant's symptoms suggest a greater severity of impairment than can be demonstrated by objective evidence alone, consideration will also be given to such factors as Plaintiff's daily activities, duration and frequency of pain, type and dosage of medication, measures used to relieve pain, and treatment other than medication. *Id.* § 404.1529(c)(3).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 16.) For example, the ALJ cited to Plaintiff's testimony that he is seeking employment and he attends a class two days a week and volunteers three times a week at a pantry performing stock work. Plaintiff is independent in caring for many of his personal needs, including cooking, cleaning, doing laundry, shopping and traveling. In addition, Plaintiff does not use prescription medication, and only uses OTC medication, as needed. In addition, on November 23, 2009, Plaintiff stated that he experienced 95% improvement in his symptoms following his August 2009 surgery. (Tr. 236.) Plaintiff returned to work following this surgery and only stopped working because he was terminated by his employer. (Tr. 30, 235.) In the August 2011 Questionnaires, Plaintiff stated that he had no problems standing, once his "back warm[ed] up," could stand for long periods, his pain was only occasional and not extreme, and pain was not usually a significant problem. (Tr. 147, 150.)

To the extent the ALJ discredited Plaintiff's testimony about the intensity, persistence and limiting effects of his symptoms based on the medical evidence, this finding is not supported

by substantial evidence. Indeed, Plaintiff's testimony was largely consistent with the medical evidence, as well as Plaintiff's prior reports to his treating and the consulting physicians about his symptoms, and did not suggest any exaggeration or overstatement. If anything, Plaintiff's statements that, he had no problems standing once his back warmed up, and that pain was not a significant issue for him, reflected his candor during the hearing. Furthermore, these statements are not inconsistent with Dr. Schwartz's conclusion that Plaintiff cannot *sit* for more than one or two hours at a time, nor do they support a finding that Plaintiff can *sit* for up to six hours at a time. Notably, at the hearing, Plaintiff also explained that his hearing difficulties may have contributed to two bad job interviews that he had recently been on.

Accordingly, the ALJ unreasonably found that the medical evidence failed to substantiate Plaintiff's testimony and allegations about his disabling symptoms.

IV.    Remedy

Accordingly, the Court remands this action, instructing the ALJ to develop the record, determine whether the opinions of Plaintiff's treating physicians deserve controlling weight, and if applicable, articulate reasons for according less than controlling weight to these opinions. The ALJ must also apply the "special technique" when evaluating Plaintiff's mental impairments. The Court additionally notes that the failure to correctly apply the treating physician rule may be intertwined with other errors in the ALJ's determination that Plaintiff is not disabled under the Act. For instance, as discussed *supra*, in considering the evidence, the ALJ failed to meaningfully consider the *combined* effect of Plaintiff's physical impairments with his mental impairments. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (requiring a determination of whether the claimant suffers from a medical impairment, or *combination of impairments*, that is "severe").

Thus, on remand, the ALJ should also consider the effects of Plaintiff's combined impairments in every step of the five–step sequential analysis.

After developing the record and according the appropriate weight to the various medical sources on the record, the ALJ should additionally reassess Plaintiff's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii). To the extent the ALJ discredits Plaintiff's statements concerning his pain or the intensity, persistence and limiting effects of his impairments, the ALJ should indicate how he assessed and balanced the various factors.

Finally, the ALJ should adequately develop the record with respect to, and explain the bases for, his RFC assessment. Among the information that the ALJ is required to obtain from a treating source at stage five of the analysis is "a statement about what [the claimant] can still do despite [his] impairment(s) based on [his] acceptable medical sources' findings on [his] factors under paragraphs (b)(1) through (b)(5) of this section." 20 C.F.R. § 404.1513(b)(6). The ALJ must also adequately explain the reasoning underlying an RFC determination and the basis on which it rests.[11] *See, e.g.*, *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 440 (S.D.N.Y. 2010) (citing cases).

If the ALJ finds on remand that Plaintiff's RFC is subject to additional limitations not presented to the VE at the February 6, 2013 hearing, then the ALJ should re-evaluate his step-five analysis to determine whether there are any jobs existing in the national economy for Plaintiff to perform in light of the additional limitations. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (finding that when hypothetical questions presented to a VE do not represent the full extent of Plaintiff's disabilities, an ALJ's

---

[11] As discussed *supra*, at a minimum, the absence of medical evidence regarding whether Plaintiff can sit for six hours in an eight-hour work day renders the ALJ's RFC current analysis unsupported by the evidence.

determination of "no disability" based on that VE's testimony cannot be supported by substantial evidence, and remand is appropriate).

*CONCLUSION*

Based on the foregoing, the Court finds that the ALJ failed to apply the correct legal standards in the correct manner, and that his conclusions of law and findings of fact are not supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is denied, and this matter is remanded for further development of the record consistent with this opinion.

SO ORDERED:


    /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: September 29, 2015
       Brooklyn, New York